Filed 3/29/24  Rav-Noy v. Khorsandi CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ZE'EV RAV-NOY, Individually and as Trustee, etc., et al., <br><br> Cross-complainants and Appellants, <br><br> v. <br><br> JACK KHORSANDI, <br><br> Cross-defendant and Respondent. | B322804 <br><br> (Los Angeles County Super. Ct. No. SC123117) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark H. Epstein, Judge.  Affirmed.

Tepper & Associates, Foster Tepper and Walter Whitman Moore for Cross-complainants and Appellants.

Azadegan Law Group, Ramin Azadegan; Joseph S. Socher, APC, and Joseph S. Socher for Cross-defendant and Respondent.

Ze'ev Rav-Noy (Rav-Noy) and his wife Varda Rav-Noy, Individually and as Trustees of the Ze'ev Rav-Noy and Varda Rav-Noy 1995 Revocable Trust and their limited liability companies, Geulah Investments, LLC (Geulah), and 9033 Wilshire, LLC (Wilshire LLC) (collectively, appellants), appeal from a judgment following an order granting summary judgment in favor of respondent Jack Khorsandi[1] on appellants' cross-complaint against Khorsandi. The cross-complaint alleged Khorsandi, along with Rabbi Hertzel Illulian and his nonprofit corporation, Jewish Educational Movement (JEM),[2] defrauded appellants in connection with two real estate transactions. The court granted summary judgment to Khorsandi solely on statute of limitations grounds. In so doing, the court rejected appellants' arguments that a reasonable trier of fact could have concluded earlier litigation between JEM, Illulian and appellants equitably tolled the statute of limitations on appellants' claims against Khorsandi. Appellants challenge that ruling, arguing there was a triable issue of fact as to whether the doctrine of equitable tolling could apply and salvage appellants' otherwise time-barred claims against Khorsandi. We hold there was no triable issue as to whether Khorsandi received the type of notice required for equitable tolling to apply. Accordingly, we affirm.

---

[1] Some portions of the record refer to respondent as "Jack Khorsandy" as well.

[2] Claims between JEM, Illulian, and appellants were submitted to rabbinical arbitration. JEM and Illulian were not named as cross-defendants and are not parties to this appeal.

## FACTS AND PROCEEDINGS BELOW

Because this appeal is from a judgment pursuant to an order granting summary judgment, in summarizing the salient facts, "[w]e consider all the evidence set forth in the moving and opposition papers except that to which objections were made and properly sustained by the trial court" and " ' "view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his or] her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 . . . .)' " (*South Lake Tahoe Property Owners Group v. City of South Lake Tahoe* (2023) 92 Cal.App.5th 735, 745 (*South Lake Tahoe*).) " 'We accept as true both the facts shown by the losing party's evidence and reasonable inferences from that evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856 . . . .)' " (*South Lake Tahoe, supra*, at p. 745.)

### A.    *Purchase of the 6317 Wilshire Property*

In 2004, Khorsandi and Illulian met with Rav-Noy, and Khorsandi presented himself as the owner of a property located at 6317 Wilshire Boulevard in Beverly Hills (the 6317 Wilshire property). Khorsandi initially offered to sell the property to Rav-Noy for $5.9 million. Khorsandi then offered to sell Rav-Noy the property for $4.9 million and to donate $1 million to JEM, Illulian's nonprofit, if Rav-Noy would agree to donate $1 million to JEM as well. Rav-Noy agreed.

Kevin Bral was the true owner of the 6317 Wilshire property at the time Rav-Noy and Khorsandi reached this agreement. Unbeknownst to Rav-Noy, Bral had agreed to sell the property to Illulian for $3,895,000. Illulian told Bral that

Khorsandi was Illulian's business partner, and asked that Bral put title in Khorsandi's name, rather than Illulian's. Illulian and Khorsandi then set up a double escrow—one for the sale from Bral to Illulian/Khorsandi, one for the sale from Khorsandi to Geulah, a limited liability company Rav-Noy formed in connection with the transaction—with simultaneous closing dates, allowing Illulian and Khorsandi to use Rav-Noy's money to pay Bral for the 6317 Wilshire property without Rav-Noy knowing of Bral's involvement. As a result, the escrow paperwork Rav-Noy received indicated that Khorsandi was the seller, whereas the escrow paperwork Bral received indicated that Khorsandi was the buyer.

Rav-Noy provided the funds with which Geulah purchased the 6317 Wilshire property. Title to the property was first transferred to Khorsandi, then immediately transferred again to Geulah. Rav-Noy also made the promised $1 million donation to JEM. Approximately $1 million from the transaction's escrow account was transferred to Khorsandi as "seller proceeds." (Capitalization omitted.)

### B. *Purchase of the 9033 Wilshire Property*

In December 2004, Illulian encouraged Rav-Noy to purchase a property located at 9033 Wilshire Boulevard in Beverly Hills (the 9033 Wilshire property). Illulian told Rav-Noy that JEM already had a contract to buy the property from a third party. Illulian proposed that JEM assign the contract to Illulian and Rav-Noy, that Illulian then negotiate and complete the purchase of the property using Rav-Noy's money, and that Illulian and Rav-Noy eventually sell the property for a profit. Around January 27, 2005, Rav-Noy agreed to this arrangement and contractually obligated

4

himself to provide the $12 million with which Wilshire LLC, a company Rav-Noy and Illulian formed for the purpose of the transaction, was to purchase the property. Rav-Noy further agreed that Illulian would receive a profit participation interest and would manage the 9033 Wilshire property until it was resold. Rav-Noy deposited $250,000 into escrow, and the third-party seller returned to JEM the $250,000 that JEM had previously deposited into escrow.

In or around April 2005, after Rav-Noy's $250,000 deposit had become nonrefundable, Illulian orally informed Rav-Noy that Khorsandi also had a contractual right to purchase the 9033 Wilshire property from the third-party seller for $12 million, but that Khorsandi would let Rav-Noy buy the property from the seller instead if Rav-Noy would agree to pay Khorsandi $2.5 million when the property was resold at some point in the future. Illulian also suggested that this arrangement was akin to Khorsandi lending Rav-Noy $2.5 million, and that Rav-Noy therefore should pay interest on it until the property was resold. Illulian and Rav-Noy referred to this proposed obligation to pay Khorsandi $2.5 million (with interest) as the " 'phantom loan.' "

Rav-Noy told Illulian that if Illulian would produce documentation supporting Illulian's assertions about Khorsandi having a right to buy the building for $12 million, then Rav-Noy would agree to pay Khorsandi the requested $2.5 million upon the resale of the building. Illulian assured Rav-Noy that Illulian would provide such documents. Illulian never did so, nor did Khorsandi ever actually have any right to purchase the property.

After escrow closed on the 9033 Wilshire property, Illulian, acting in his role as vice president of operations of Wilshire LLC,

withdrew funds from the company account on a monthly basis, ostensibly to pay interest to Khorsandi on what Illulian and Rav-Noy referred to as the phantom loan. Rav-Noy agreed to this, believing Illulian's representations that the requested documentation of Khorsandi's right to purchase the property would be forthcoming. After several months, Rav-Noy demanded that Illulian stop using Wilshire LLC's money to pay Khorsandi interest on the phantom loan, because Rav-Noy had not received the requested documentation.

## C.    *Disputes Arise Between Rav-Noy and Illulian*

By July 2008, disputes arose between Illulian and Rav-Noy regarding Illulian's management of the two properties. According to Rav-Noy, the disputes regarding the 9033 Wilshire property resulted from Illulian failing to maintain the property in good condition, pay property taxes, or collect rent increases from tenants. As to the 6317 Wilshire property, according to Rav-Noy, Illulian rented the property to an illegal marijuana business, triggering a Drug Enforcement Administration investigation, and refused to cooperate with Rav-Noy's efforts to sell the property. Rav-Noy terminated Illulian from his membership in both Geulah and Wilshire LLC, pursuant to the terms of the respective operating agreements for these entities.

On July 17, 2008, Illulian's attorney sent Rav-Noy a letter claiming that Rav-Noy owed JEM $2.5 million under the phantom loan arrangement, because Khorsandi and JEM had purportedly agreed Khorsandi would pay JEM the $2.5 million he was to receive pursuant to that arrangement when the 9033 Wilshire property was sold.

As to the 6317 Wilshire property, Illulian initially refused to vacate his office there, complicating Rav-Noy's efforts to

6

sell the property, and ultimately leading to Geulah (through Rav-Noy) bringing an unlawful detainer action against Illulian. At the unlawful detainer trial, Illulian testified that Khorsandi had owned the 6317 Wilshire property through "some kind of partnership" with Bral. Geulah prevailed at trial, Illulian vacated the 6317 Wilshire property, and Geulah (through Rav-Noy) sold the property to a third party.

### D. *Rabbinical Arbitration of Certain Disputes Between Illulian, JEM, and Rav-Noy*

On July 29, 2009, Rav-Noy signed an agreement to submit Rav-Noy and Illulian's disputes regarding both properties to rabbinical arbitration. Illulian did not sign the agreement at that time. Without a fully-executed arbitration agreement yet in place, on October 15, 2009, appellants filed a civil lawsuit against Illulian for breach of contract and false promise. The false promise claim was based on allegations that Illulian had falsely "represented to [Rav-Noy and Geulah] that [Illulian] would perform [his] obligations under the agreements, but those representations were false in that [he] did not ever intend to perform [his] obligations under the agreements." The initial complaint did not identify any of the specific obligations or contractual terms of the agreement. Nor did the complaint mention Khorsandi.

On November 8, 2009, after being served with appellants' complaint, Illulian signed the arbitration agreement.

On April 16, 2010, during a deposition in connection with the arbitration, the company that had sold the 9033 Wilshire property to Wilshire LLC confirmed that Khorsandi had never had any right to buy the property or control who did. On April 22, 2010, Bral, who had sold the 6317 Wilshire property

7

to Geulah, provided a notarized declaration describing Khorsandi's and Illulian's true roles in the purchase of that property, as described above.

On April 26, 2010, Rav-Noy and Illulian signed a second arbitration agreement, adding JEM—but not Khorsandi—as a party.

At the conclusion of the arbitration in June 2014, the arbitrators declined to announce a decision. Illulian then filed the instant action seeking damages against appellants. Appellants moved unsuccessfully to compel further rabbinical arbitration pursuant to the agreement between Rav-Noy and Illulian, and then appealed the adverse ruling. This court affirmed. In 2015, while that appeal was pending, JEM filed a report with the California Secretary of State identifying Khorsandi as JEM's chief financial officer. Promptly after remittitur issued, on February 22, 2018, appellants filed their cross-complaint in the instant action, for the first time adding Khorsandi as a party. The cross-complaint alleged, inter alia, claims for fraud and unfair competition against Illulian, JEM, and Khorsandi.

In the cross-complaint, appellants alleged that "[t]he first time that [they] had any reason to suspect that Khorsand[i] was not the real owner of the [6317 Wilshire property] was in 2009, when [they] received their client files from their former attorneys, who had represented [both appellants] and Illulian and JEM [previously], . . . [and] refused to deliver [appellants'] client files." Appellants more specifically alleged that, in February 2009, Rav-Noy filed a lawsuit to obtain the client files from that firm, at which time Rav-Noy "suspected in particular" that the attorneys' refusal to turn over the files was "in order to

8

conceal misconduct." Appellants alleged that, through this action and additional subpoenas, they ultimately received the paperwork associated with the double escrow in the 6317 Wilshire property transaction and learned of Khorsandi's true role therein in April 2010. At a subsequent deposition in 2020, however, Rav-Noy testified that he first learned of the double escrow and that "Jack Khorsandi was involved in [the] double escrow" in "approximately 2008."

### E. *Summary Judgment Motion*

Khorsandi moved for summary judgment, and the trial court granted the motion on statute of limitations grounds.

The trial court found applicable the doctrine of delayed discovery, under which any applicable statute of limitations does not begin to run "until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).) The court noted that "Rav-Noy explicitly attest[ed] in his deposition and declaration that he realized he was defrauded regarding the sale in 2008 at the earliest, or 2009 at the latest[, and that] [i]n both his deposition and declaration, he admits he knew Khorsandi was involved." On this basis, the court concluded the claims had accrued in 2009.

The court rejected arguments that the statute had been equitably tolled, because nothing supported the first requirement of equitable tolling: timely notice to Khorsandi of appellants' possible claims against him. In so concluding, the court found no evidence suggested Khorsandi had been officially affiliated with JEM before 2015, so Khorsandi's officer role at the company did not impute notice to him of the pending lawsuit and arbitration against JEM that began many years before 2015.

9

The court also rejected appellants' arguments that their proffered evidence of Illulian's ongoing relationship with Khorsandi during the arbitration and thereafter provided a basis on which to infer Khorsandi had notice of appellants' potential claims against him regarding the two properties. To support this argument, appellants relied on Khorsandi being JEM's chief financial officer in 2016 and Illulian's 2020 deposition testimony regarding the nature of his ongoing relationship with Khorsandi.[3] Appellants also relied on evidence that, from March 2018 to July 2021, Khorsandi, Illulian and JEM were criminal codefendants in an action filed by the State of California for fire code violations at a building owned by JEM. Finally, appellants relied on Khorsandi's 2020 deposition that he discussed the rabbinical arbitration with Illulian "maybe a couple of years ago."

The court stated that even if Khorsandi was aware of the claims and arbitration between JEM/Illulian and Rav-Noy, and even if Illulian had discussed the litigation, arbitration, or real estate transactions with Khorsandi, this would not have put Khorsandi on notice that Rav-Noy or any of the other appellants intended to pursue potential claims *against Khorsandi*.

---

[3] Therein, Illulian testified as follows: "Khorsandi is very close to me, a close friend, a confid[a]nt. . . . I work with him when his—when I have real estate things, I ask him. . . . Mr. Khorsandi helps me many different aspects." "I speak to him about all the deals, anything that comes in real estate or stuff[,] I always consult with him." Illulian further testified at his deposition that Khorsandi had donated money to JEM "[m]any times," donates "[a]ll the time," may have loaned money to JEM, and "was one of the people officially in the . . . documents of JEM" in 2015 or 2016.

10

Finally, the court noted that appellants had failed to establish another element of equitable tolling: that they had diligently and in good faith pursued claims against Khorsandi once Rav-Noy suspected Khorsandi's involvement in the allegedly fraudulent real estate transactions.

After the court granted Khorsandi motion for summary judgment, it entered judgment on appellants' cross-complaint in Khorsandi's favor. Appellants timely appealed.

## DISCUSSION

On appeal from a judgment following an order granting summary judgment, our review is de novo. (*South Lake Tahoe, supra,* 92 Cal.App.5th at p. 745.) " 'A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).)' " (*South Lake Tahoe, supra*, 92 Cal.App.5th at p. 745.) " 'Summary judgment is appropriate only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. [Citation.]' [Citation]." (*South Lake Tahoe, supra*, at pp. 745–746.)

### A. *Date of Discovery for Purposes of Calculating Statute of Limitations*

The unfair competition claim in appellants' cross-complaint against Khorsandi is subject to a four-year statute of limitations.

(Bus. & Prof. Code, § 17208.)  The fraud and all other causes of action in the cross-complaint are subject to a three-year statute of limitations.  (Code Civ. Proc., § 338, subd. (d); *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1670.)  Neither party contends that these statutes of limitations began to run at the time the alleged misconduct occurred.  Rather, all agree that the statute began to run at the time appellants "discover[ed], or ha[d] reason to discover" Khorsandi's alleged misconduct.  (*Fox, supra,* 35 Cal.4th at p. 807.)  They disagree, however, as to when that occurred.  Appellants contend that Rav-Noy first learned of Khorsandi's true role in the alleged real estate schemes in April 2010, when Rav-Noy received certain discovery in arbitration.  Khorsandi contends appellants were sufficiently aware of Khorsandi's involvement at least a year before then, and possibly as early as 2008, based on Rav-Noy's deposition testimony that he suspected Khorsandi was part of a fraud in connection with the 6317 Wilshire property transaction in "approximately 2008."

We need not resolve this dispute.  Even accepting the later discovery date of April 2010, given the applicable three- and four-year statutes of limitations, the only way there could be a triable question as to whether Rav-Noy's February 2018 cross-complaint was time-barred is if there is a triable question regarding the statute being equitably tolled for a significant portion of the time between April 2010 and February 2018.  For reasons we outline below, however, we conclude the trier of fact could not reasonably conclude that the doctrine of equitable tolling applies.

## B.  *Equitable Tolling*

The equitable tolling doctrine "allows our courts, 'in carefully considered situations' [citation], to exercise their

inherent equitable powers to 'soften the harsh impact of technical rules' [citation] by tolling statutes of limitations." (*Saint Francis Memorial Hospital v. State Dept. of Public Health* (2020) 9 Cal.5th 710, 724 (*Saint Francis*).)  "[E]quitable tolling today applies when three 'elements' are present:  '[(1)] timely notice, and [(2)] lack of prejudice, to the defendant, and [(3)] reasonable and good faith conduct on the part of the plaintiff.' (*Addison* [*v. State of California* (1978)] 21 Cal.3d [313,] 319 [(*Addison*)].) These requirements are designed to 'balanc[e] . . . the injustice to the plaintiff occasioned by the bar of his claim against . . . the important public interest or policy expressed by the [operative] limitations statute.' [Citation.]" (*Saint Francis, supra*, at pp. 724–725.)

Appellants argue that, based on the evidence before the court at summary judgment, a reasonable trier of fact could find they had established the elements of equitable tolling. We disagree that there was a triable question as to the first element—timely notice to Khorsandi—and thus need not consider whether appellants met the remaining requirements.

" ' "The timely notice requirement [for equitable tolling] essentially means that the first claim must have been filed within the statutory period . . . [and that] the filing of the first claim must alert the defendant in the second claim of the need to begin investigating the facts which form the basis for the second claim." ' " (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 102, fn. 2 (*McDonald*).) Although " ' "[g]enerally this means that the defendant in the first claim is the same one being sued in the second," [citation]' " a defendant also may be " ' "alert[ed]" ' " by other means to the need " ' "to begin investigating the facts which form the basis for

the . . . claim [against that defendant].” ’ ” (*Ibid.*)  Specifically, when during the limitations period the defendant was put on notice that the plaintiff intended to hold *that defendant* legally responsible for the plaintiff's injury, this, too, can satisfy the equitable tolling doctrine's notice requirement—even if that defendant was not named in an earlier lawsuit filed by that plaintiff.  This is because a reasonable defendant, upon receiving notice that a plaintiff intends to seek legal recourse against the defendant regarding certain conduct, will understand the need to begin investigating and/or preserving evidence regarding such conduct, even if the plaintiff has not yet filed suit against him. A necessary corollary to this understanding of equitable tolling notice is that a defendant knowing a plaintiff has sued *someone else* regarding that conduct—at least without also receiving notice that the plaintiff intends to hold the defendant legally responsible as well—does not satisfy the notice requirement. This is because a reasonable defendant under such circumstances would have no need to begin preserving evidence or investigating plaintiff's claims.  Indeed, under such circumstances, the defendant could only speculate as to what claims against it, if any, the plaintiff might one day pursue, and thus what the defendant might investigate or what evidence he might preserve. This is consistent with “the [equitable tolling] doctrine's underlying rationale and purpose,” as the doctrine “is designed to apply when a plaintiff has ‘ “satisfied the notification purpose of a limitations statute” ’ (*McDonald, supra*, 45 Cal.4th at p. 102.)” (*Saint Francis, supra*, 9 Cal.5th at p. 727.)  The “ ‘notification purpose of a limitations statute’ ” is specific to a particular defendant:  that is, it requires a plaintiff, within a certain time frame, to “afford[ ] a defendant notice of the claims *against it*

14

[i.e., the defendant] so that [the defendant] may gather and preserve evidence." (*McDonald, supra*, at p. 102, italics added.)

Our colleagues in the Fifth District have expressly recognized that notice of a plaintiff's intent to hold a defendant legally responsible for certain conduct may satisfy the notice requirement for equitable tolling claims against the defendant based on that conduct, but that notice of a plaintiff's lawsuit against someone other than defendant cannot. (See *Garabedian v. Skochko* (1991) 232 Cal.App.3d 836, 847–848 (*Garabedian*).) Specifically, in *Garabedian*, the Fifth District held that "the doctrine of equitable tolling does not apply merely because defendant B has obtained timely knowledge of a claim against defendant A for which defendant B knows or believes he may share liability. This point seems to have been recognized in *Collier v. City of Pasadena* (1983) 142 Cal.App.3d 917 . . . , in which the court stated, 'under ordinary circumstances [a] workers' compensation claim would not equitably toll a personal injury action against a third party who might also be liable for the injury.' ([*Id.*] at pp. 924–925.)" (*Garabedian, supra*, at p. 847.) Applying this concept, *Garabedian* concluded that "although [plaintiff's] filing the [earlier in time] claim . . . put the agency on notice of [plaintiff's] intended suit against the government, it did not put [defendant] on notice of [plaintiff's] intended suit against him." (*Id.* at p. 848.)

Appellants argue we should not follow *Garabedian* because "the timely notice element, as applied in modern cases"— presumably referring to the cases appellants cite in their briefs

15

as supporting their interpretation of the notice requirement[4]— "does not require the plaintiff to prove that, when the plaintiff filed the first action, the plaintiff intended at that time to sue the defendant." Although these cases on which appellants rely may not expressly identify notice of plaintiff's intent to hold the defendant legally responsible as the applicable test, they are all consistent with this framework. For example, in *Saint Francis, supra*, 9 Cal.5th 710, a hospital disagreed with an administrative decision of the Department of Public Health and submitted a request for reconsideration of that decision. (*Id.* at p. 718.) The hospital also wrote to the department "that, if the request for reconsideration was denied, it 'intend[ed] to petition for a writ of mandate with the superior court.'" (*Ibid*, capitalization omitted.) The hospital ultimately did seek such a writ, but after the time period for doing so had expired. (*Id.* at p. 719.) The Supreme Court concluded that, although the hospital had not sued or sought legal recourse against the department in the earlier administrative proceedings, the "request for reconsideration, together with the e-mail notifying the [defendant's] counsel of its intent to file a petition for a writ of administrative mandate [within the limitations period] . . . provided the [defendant] with timely notice" that "satisfied the first element of equitable tolling." (*Id.* at p. 727.) *St. Francis* thus involved a situation in which the defendant had timely

---

[4] Namely, these cases are: *Saint Francis, supra*, 9 Cal.5th 710, *Apple Valley Unified School District v. Vavrinek, Trine, Day & Co.* (2002) 98 Cal.App.4th 934 (*Apple Valley*), *Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736 (*Hopkins*), and, indirectly, *Structural Steel Fabricators, Inc. v. City of Orange* (1995) 40 Cal.App.4th 459 (*Structural Steel*) and *Stalberg v. Western Title Ins. Co.* (1994) 27 Cal.App.4th 925 (*Stalberg*).

16

notice regarding plaintiff's intent to seek relief from the defendant, even though the plaintiff ultimately sought that relief in an untimely fashion.  That this was sufficient to satisfy the equitable tolling notice requirement is consistent with our view, and that expressed in *Garabedian*, that the notice required for equitable tolling depends on notice of a plaintiff's intent to seek relief from the particular defendant at issue.

Further, as noted in another case on which appellants rely, *Apple Valley, supra,* 98 Cal.App.4th 934, other "decisions applying equitable tolling against defendants who were not parties to the prior action[ ] . . . involve fact situations in which the defendants clearly had notice of the claims against them before the statutes expired."  (*Id.* at p. 955 [collecting cases].)  *Apple Valley* discusses two cases in particular, both of which are likewise consistent with our understanding of the equitable tolling notice requirement:  *Structural Steel, supra,* 40 Cal.App.4th 459 and *Stalberg, supra,* 27 Cal.App.4th 925.  (See *Apple Valley, supra*, at pp. 955–956.)  In *Structural Steel*, a subcontractor sued a general contractor and its surety to obtain payment for certain construction work, then later sued the city in a separate action seeking payment for the same construction work.  (*Structural Steel*, *supra*, at pp. 462–463.)  The Court of Appeal rejected the city's argument that the statute of limitations barred the suit, citing equitable tolling.  (*Id.* at p. 466.)  With respect to the notice requirement of equitable tolling, the court concluded that the city had received notice of the plaintiff's claim against it within the limitations period, because (1) at the time the subcontractor sued the general contractor and surety—i.e., within the limitations period—the subcontractor sent a letter informing the city of the lawsuit and stating the city might also

17

be liable (*ibid.*) and (2) even before the subcontractor sued the contractor and surety, the subcontractor served a stop notice on the city demanding that it withhold payment from the surety to cover the subcontractor's claim (*id.* at p. 462).

Similarly, in *Stalberg, supra,* 27 Cal.App.4th 925, the plaintiffs' title insurer had recorded deeds for upstream property owners, which included a fictitious easement across the plaintiffs' properties. (*Id.* at pp. 929–930.) The plaintiffs filed a quiet title suit against the upstream owners, then later filed a separate untimely slander of title suit against their insurer. (*Id.* at p. 930.) In concluding the insurer had sufficient notice for equitable tolling to apply to the latter suit, the court noted, inter alia, that "[d]uring the progress of the quiet title litigation [against the upstream owners], plaintiffs learned that [the insurer] was responsible for the recording of the fictitious easement" and "corresponded with [the insurer], informing [it] of their awareness of its culpability in this matter, and, upon the completion of the quiet title action, plaintiffs promptly filed an action against [the insurer]." (*Id.* at p. 933.)

In the above cases, the defendant at issue received, during the limitations period, notice of the plaintiff's intent to pursue claims *against that defendant* or otherwise hold *that defendant* responsible—not just notice of the plaintiff's intent to pursue claims against some other defendant, or to generally pursue claims regarding a particular incident. (Cf., e.g., *Aguilera v. Heiman* (2009) 174 Cal.App.4th 590, 600 ["no timely notice" to an individual on whose property the plaintiff was injured where plaintiff "timely filed for workers' compensation" in connection with the injury but "the workers' compensation claim nam[ed] as defendant only [plaintiff's employer and an insurance-related

18

entity]" and did not add the individual until after the limitations period had expired], capitalization omitted.)  This is not clearly the case, however, in the final decision appellants cite for this point, *Hopkins, supra,* 225 Cal.App.4th 736.  Nevertheless, *Hopkins* is consistent with our understanding of the equitable tolling notice requirement.  Appellants describe *Hopkins* as holding that "equitable tolling applied [to a suit] against [the] building owner [defendants] in [a] premises liability case based on [a] prior workers' compensation proceeding against plaintiff's employer, where building owner[s] knew about, but [were] not a party to, [the] prior proceeding."  But in *Hopkins*, "[i]t appear[ed] [to the Court of Appeal] to be undisputed that [defendants] received notice of the need to begin to investigate the facts that formed the basis of [plaintiff's] claims well within the ordinary statute of limitations period."  (*Id.* at p. 751.)  As a basis for this conclusion, *Hopkins* notes that the defendants, through their insurer, had "undert[aken] an investigation into the accident [at issue]" during the limitations period, including, for example, obtaining the plaintiff's medical records.  (*Id.* at p. 751, fn. 8.)  Because the purpose of assuring the defendant received notice of the plaintiff's intent to seek legal recourse against the defendant is to assure the defendant has the opportunity to investigate the plaintiff's potential claims, the lack of such notice in *Hopkins* was not prejudicial—the defendants were already undertaking such investigation.  Moreover, *Hopkins* did not go so far as to hold that these facts supported equitable tolling notice, but rather held that "[t]he trial court's reasons for determining that the equitable tolling doctrine does *not* apply in this case [were] legally insufficient" and "remanded to the trial court for a determination as to whether [plaintiff] demonstrated the required elements of

equitable tolling." (*Id.* at p. 746, italics omitted.) *Hopkins* thus does not reject or call into question the framework we set out above.

Applying these principles to the case at bar, we conclude that appellants have not identified any facts based on which the jury could find Khorsandi was put on notice during the limitations period of appellants' intent to hold him legally responsible for their alleged injuries at issue in the earlier litigation with JEM and Illulian. Appellants did not name Khorsandi as a defendant in their earlier claims (in litigation or arbitration). Nothing suggests actual notice to Khorsandi during the limitations period of appellants' intent to sue him, as there was in *Structural Steel* and *Stalberg*. Nor did appellants seek some other relief from Khorsandi during the limitations period, similar to what occurred in *Saint Francis*. Nor did Khorsandi undertake an investigation of appellants' potential claims against him, as occurred in *Hopkins*, such that a failure to satisfy the equitable tolling notice requirement might not be prejudicial.[5] Without notice during the limitations period that appellants

---

[5] Appellants briefly argue that Khorsandi similarly investigated Rav-Noy's claims against him by writing "to the escrow company in [August] 2008 to secure copies of records from the two escrows that Khorsandi and Illulian used to defraud Rav-Noy" and that "[t]he trier of fact can infer that Khorsandi did so because he knew about the dispute; anticipated litigation; and was collecting evidence accordingly." But the only dispute between the parties at the time of that request involved Illulian's management of the properties and had nothing to do with the circumstances under which Rav-Noy purchased the properties. The record thus does not support the inference that appellants posit, and does not provide a basis for *Hopkins* to guide our result.

20

intended to seek legal recourse against Khorsandi regarding the real estate transactions, there was nothing to "alert [Khorsandi] . . . of the need to begin investigating the facts which form the basis for" appellants' untimely claims against him regarding those transactions. (*McDonald, supra,* 45 Cal.4th at p. 102, fn. 2.)

Appellants make several arguments that presuppose notice to Khorsandi of the litigation against Illulian and JEM is sufficient to establish equitable tolling notice. For example, appellants argue the evidence here "would readily permit the trier of fact to find that Illulian, JEM and Khorsand[i] were co-conspirators[,]" a finding that "would be all that the law requires to impute the knowledge of each co-conspirator to the others. . . . [¶] In other words, the law presumes what common sense dictates: Illulian, JEM and Khorsand[i], as co-conspirators, would of course keep one another informed about legal proceedings involving victims of their multimillion dollar fraudulent schemes." Similarly, appellants point to evidence suggesting that Khorsandi was a confidant of Illulian, and that Illulian sought advice from Khorsandi on real estate matters, allowing the jury to infer Illulian kept Khorsandi abreast of appellants' lawsuits against JEM and Illulian regarding the real estate transactions in question. We do not disagree that this and other evidence presented at summary judgment support a triable issue as to whether Khorsandi had notice during the limitations period that appellants were suing and pursuing relief from *JEM and Illulian*, rather than Khorsandi, in connection with the two real estate transactions. But, for the reasons set forth above, this does not establish notice that appellants intended to pursue a lawsuit against Khorsandi regarding those transactions,

and is thus insufficient to satisfy the equitable tolling notice requirement.  (See *Garabedian, supra,* 232 Cal.App.3d at pp. 847–848.)

Accordingly, we conclude the trial court did not err in finding no triable issue as to the notice requirement of equitable tolling, and in granting summary judgment based on the statute of limitations.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded his costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WEINGART, J.